IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 8:05CR256 |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| RICKY T. McCOLLUM, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WANDA T. McCOLLUM, | ) | |
| | ) | |
| Interested Person. | ) | |

This is a quirky case involving a criminal forfeiture. It presents the government's understandable desire to disrupt the use of guns and drugs and the equally understandable desire of a strong-willed, elderly woman to preserve the legitimate legacy of her deceased, but much loved husband.

Wanda L. McCollum, appearing pro se,[1] asserts that the government may not deprive her of a gun collection that she inherited from her husband even though it was possessed by her ne're-do-well son, a recently convicted felon who has agreed to the forfeiture. In addition to Mrs. McCollum's argument regarding the gun collection, she also claims to be a bona fide purchaser of some of the items sought to be forfeited that were not a part of the gun collection.

---

[1] I compliment Assistant United States Attorney Nancy A. Svoboda for the kindness and fair treatment she has afforded Mrs. McCollum. Such civility is consistent with the best traditions of the Department of Justice and the bar of this court.

With the exception of two rifles, a receiver and all the ammunition, I rule in favor of Mrs. McCollum.   I next explain why I have arrived at this decision.

## I.  BACKGROUND

Pursuant to 21 U.S.C. § 853(n) (criminal forfeiture and third-party interests), Mrs. McCollum filed a notarized "petition" on May 4, 2006.  (Filing 75.)[2]   An evidentiary hearing was held on June 15, 2006.  Testimony was taken (filing 85 (witness list)) and exhibits were received.  (Filing 86 (exhibit list).)  A transcript (Tr.) was prepared.  (Filing 89.)   The parties have been given an opportunity to brief the matter.   Mrs. McCollum has submitted a letter which I consider to be her brief.  (Filing 91.)[3]  The government has submitted a brief.  (Filing 90.)

Mrs. McCollum also sent me another letter in response to the government's brief, but since I did not give her permission to submit a response to the government's submission, I will not consider it.  I will send a copy of this second letter to the government's lawyers so they know what was sent to me.

Pursuant to 21 U.S.C. § 853(n)(5), I must also consider "the relevant portions of the record of the criminal case which resulted in the order of forfeiture."   Having done so, the matter is now ripe for decision.

I first examine the case presented against Ricky T. McCollum (the defendant). After that, I examine the matter from the perspective of Wanda T. McCollum (Mrs. McCollum).   Then, I consider the evidence presented by the government regarding Mrs. McCollum's claims.

---

[2]The government does not claim that petition was untimely.

[3]In her letter, Mrs. McCollum asked that I return a hand drawn picture of her husband that she inadvertently included with her exhibits.  I have done so.

## A.   *The Case Against the Defendant*

The defendant was charged with and pled guilty to selling a gun to a known drug user in violation of 18 U.S.C. §§ 922(d)(3) & 924(a)(2). (Filing 34 (Count I of Superseding Indictment) and Filing 63 (Plea Agreement).)  Admitting the allegations of Count III of the superseding indictment, he also agreed that his interest in numerous weapons, a receiver and a lot of ammunition should be forfeited pursuant to 21 U.S.C. § 853.[4]  Accordingly, I forfeited the defendant's claim to following property:

| | |
|---|---|
| I. | Ammunition, Qty: 1; MNF: other, Cal: 37 |
| II. | Ammunition, Qty: 19; MNF: Remington, Cal: 257 |
| III. | Rifle, Model: Hoban Rifle, Cal: 22, SN: 45 |
| IV. | Receiver, Model: Model 98, Cal: **, SN: none |
| V. | Shotgun, MNF: unknown. Receiver only, Model: unknown, Cal: **, SN: none |
| VI. | Ammunition, Assorted, Qty: 111; MNF: Remington, Cal: 12 |
| VII. | Shotgun, MNF: Ithaca Gun Co. Model: 51 Fetherlight, Cal: 12, SN: 510019487 |
| VIII. | Ammunition, Qty: 188; MNF: unknown, Cal: 765 |
| IX. | Rifle, MNF: unknown, Model: McCollums, Cal: 270, SN: 003 |
| X. | Shotgun, MNF: unknown, Model: Hiawatha 130 Vr-F, Cal: 20, SN: none |
| XI. | Shotgun, MNF: Savage, Model: 94 series M, Cal: 410, SN: C517713 |
| XII. | Shotgun, MNF: unknown, Model: SB-100B, Cal: 20, SN: B084872 |
| XIII. | Ammunition, Assorted Qty: 22; MNF: other, Cal: 257 |
| XIV. | Ammunition, Qty: 54; MNF: Remington, Cal: 7 |
| XV. | Ammunition, Qty: 1; MNF: Winchester-Western, Cal: 300 |
| XVI. | Ammunition, Qty: 6; MNF: Remington, Cal: 22-250 |
| XVII. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 270/20 |

---

[4]In exchange for these pleas, the government dismissed Count II of the Superseding Indictment which alleged that McCollum, being an unlawful user of a controlled substance, possessed a firearm transported in interstate commerce. (Filing 80 (Judgment).)

| | |
|---|---|
| XVIII. | Ammunition, Qty: 11; MNF: Winchester-Western, Cal: 308 |
| XIX. | Ammunition, Qty: 78; MNF: Federal, Cal: 30-06 |
| XX. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 243 |
| XXI. | Ammunition, Qty: 51; MNF: Winchester-Western, Cal: 30-30 |
| XXII. | Ammunition, Qty: 11; MNF: unknown, Cal: 792 |
| XXIII. | Ammunition, Qty: 1; MNF: Winchester-Western, Cal: 220 |
| XXIV. | Ammunition, Qty: 142; MNF: Federal, Cal: 12 |
| XXV. | Ammunition, Qty: 8; MNF: unknown, Cal: 50 |
| XXVI. | Ammunition, Qty: 4; MNF: Remington, Cal: 44 |
| XXVII. | Shotgun, MNF: Harrington and Richardson, Model: 155, Cal: 45-70, SN: AM288419 |
| XXVIII. | Ammunition Components, Qty: 1720; MNF: Winchester-Western, Cal: ** |
| XXIX. | Ammunition, Qty: 51; MNF: Federal, Cal: 12 |
| XXX. | Ammunition, Qty: 226; MNF: Remington, Cal: 12 |
| XXXI. | Ammunition, Qty: 400; MNF: other, Cal: 762 |
| XXXII. | Ammunition, Qty: 164; MNF: Winchester-Western, Cal: 12 |
| XXXIII. | Ammunition, Qty: 50; MNF: Winchester-Western, Cal: 16 |
| XXXIV. | Ammunition, Qty: 20; MNF: Winchester-Western, Cal: 20 |
| XXXV. | Ammunition, Qty: 9; MNF: Westerfield, Cal: 20 |
| XXXVI. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 10 |
| XXXVII. | Ammunition, Assorted, Qty: 97; MNF: Remington, Cal: 22 |
| XXXVIII. | Rifle, MNF: Savage, Model: 170B, Cal: 30-30, SN: D262099 |
| XXXIX. | Rifle, MNF: Marlin Firearms Co., Model: Glenfield Model 10, Cal: 22, SN: unknown |
| XL. | Ammunition, Qty: 28; MNF: Remington, Cal: 410 |
| XLI. | Shotgun, MNF: Laurona-Armas Eibar, S.A.L., Model: Double Barrel, Cal: ZZ, SN: 816421 |
| XLII. | Ammunition, Qty: 3; MNF: Remington, Cal: 10 |
| XLIII. | Ammunition, Qty: 10; MNF: Remington, Cal: 28 |
| XLIV. | Ammunition, Qty: 4; MNF: Fiocchi, Cal: 303 |
| XLV. | Shotgun, MNF: unknown, Model: JC Higgins 583.16, Cal: 12, SN: none |
| XLVI. | Ammunition, Qty: 72; MNF: LC (Lake City), Cal: 30 |
| XLVII. | Ammunition, Qty: 14; MNF: Winchester-Western, Cal: 45 |
| XLVIII. | Ammunition, Qty: 22; MNF: PMC, Cal: 223 |
| XLIX. | Ammunition, Qty: 5; MNF: Winchester-Western, Cal: 44 |
| L. | Ammunition, Qty: 40; MNF: other, Cal: 6 |

LI.        Ammunition, Qty: 50; MNF: United States Cartridge Co., Cal: 9
LII.       Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 380
LIII.      Shotgun, MNF: Ithaca Gun Co., Model: Double Barrel, Cal: ZZ, SN: unknown
LIV.       Rifle, MNF: Bellmore-Johnson Tool, Model: Bolt Action, Cal: 22, SN: unknown
LV.        Shotgun, MNF: Hopkins and Allen, Model: Double Barrel, Cal: ZZ, SN: unknown
LVI.       Handgun, MNF: unknown, Manufacturer Type: Revolver, Model: OFI Western Ranger, Cal: 22, SN: RR00241
LVII.      Rifle, MNF: Hipoint, Model: 995, Cal: 9, SN: A20651
LVIII.     Rifle, MNF: Serbu Firearms, Model: BFG-50, Cal: 50, SN: 523
LIX.       Rifle, MNF: Harrington and Richardson, Model: Topper Model 158, Cal: 30-30, SN: AS205284
LX.        Rifle, MNF: Ranger Arms Inc., Model: 103, Cal: 22, SN: none
LXI.       Rifle, MNF: Western Arms Co., Model: 59, Cal: 22, SN: none
LXII.      Shotgun, MNF: Westley, Richard, Model: Double Barrel, Cal: 16, SN: 51389
LXIII.     Rifle, MNF: unknown, Model: Bolt Action Rifle, Cal: 308, SN: 001
LXIV.      Shotgun, MNF: unknown, Model: Double Barrel, Cal: 16, SN: none
LXV.       Rifle, MNF: unknown, Model: unknown, Cal: 410, SN: 49061
LXVI.      Rifle, MNF: Harrington and Richardson, Model: 700 22 WMRF, Cal: 22, SN: AS501498
LXVII.     Shotgun, MNF: unknown, Model: none listed, Cal: 410, SN: none
LXVIII.    Shotgun, MNF: unknown, Model: Batavia Leader, Cal: 16, SN: 95218
LXIX.      Shotgun, MNF: Remington Arms Company Inc., Model: Double Barrel, Cal: 16, SN: 1087
LXX.       Shotgun, MNF: unknown, Model: 60, Cal: 12, SN: none
LXXI.      Shotgun, MNF: Marlin Firearms Co., Model: Marlin Goose Gun, Cal: 12, SN: 71375287
LXXII.     Rifle, MNF: unknown, Model: 1915, Cal: 22, SN: M347
LXXIII.    Rifle, MNF: unknown, Model: Six Corp, Cal: 762, SN: 8803159
LXXIV.     Rifle, MNF: Winchester, Model: 67, Cal: 22, SN: none
LXXV.      Rifle, MNF: Hopkins and Allen, Model: none listed, Cal: 22, SN: none

| | |
|---|---|
| LXXVI. | Rifle, MNF: R.B. Rodda, Model: none listed, Cal: 243, SN: 26599 |
| LXXVII. | Shotgun, MNF: Hopkins and Allen, Model: Double Barrel, Cal: 16, SN: 32483 |
| LXXVIII. | Rifle, MNF: Chipmunk Manufacturing Co., Model: Chipmunk 22 SL, Cal: 22, SN: 22411 |
| LXXIX. | Shotgun, MNF: unknown, Model: none listed, Cal: 12, SN: 58044A |
| LXXX. | Rifle, MNF: Italy, Model: Fillipietta Cat 3046, Cal: 22, SN: SA6882 |
| LXXXI. | Rifle, MNF: Remington Arms Company Inc., Model: Fieldmaster 572, Cal: 22, SN: A1414103 |
| LXXXII. | Rifle, MNF: unknown, Model: UNK, Cal: 308, SN: none |
| LXXXIII. | Rifle, MNF: unknown, Model: M1 Carbine, Cal: 30, SN: none |
| LXXXIV. | Rifle, MNF: unknown, Model: none listed, Cal: 762, SN: 61295 |
| LXXXV. | Rifle, MNF: BSA (Birmingham Small Arms), Model: Lever Action, Cal: 32, SN: 19314 |
| LXXXVI. | Rifle, MNF: Savage, Model: 15, Cal: 22, SN: none |
| LXXXVII. | Rifle, MNF: Mossber, Model: 810AHT, Cal: 30-06, SN: 1010064 |
| LXXXVIII. | Rifle, MNF: Winchester, Model: 74, Cal: 22, SN: 274591A |
| LXXXIX. | Rifle, MNF: Remington Arms Company, Inc., Model: 12-C, Cal: 22, SN: RW448317 |
| XC. | Rifle, MNF: Browning, Model: UNK, Cal: 12, SN: 0017 |
| XCI. | Rifle, MNF: Harrington and Richardson, Model: Shikari 155, Cal: 44, SN: AS228207 |
| XCII. | Rifle, MNF: Harrington and Richardson, Model: Topper M48, Cal:410, SN: J55626 |
| XCIII. | Rifle, MNF: Harrington and Richardson, Model: 176 10 G Magnum, Cal: 10, SN: AS217937 |
| XCIV. | Shotgun, MNF: Ranger Arms Company, Inc., Model: UNK, Cal: 12, SN: 4370 |
| XCV. | Shotgun, MNF: Remington Arms Company, Inc., Model: 870, Cal:12, SN: 840197V |
| XCVI. | Rifle, MNF: Springfield Firearms Corporation, Model: UNK, Cal: 22, SN: none |
| XCVII. | Shotgun, MNF: Springfield Firearms Corporation, Model: UNK, Cal: 12, SN: Y370 |
| XCVIII. | Shotgun, MNF: Mossberg, Model: 1000, Cal: 12, SN: FD09288 |
| XCIX. | Rifle, MNF: Mauser, Model: Argentino 1891, Cal: **, SN: B9190 |

C.        Shotgun, MNF: Savage, Model: 77F, Cal: 12, SN: none
CI.       Shotgun, MNF: Remington Arms Company, Inc., Model: 870, Cal: 16, SN: S669351V
CII.      Shotgun, MNF: Unknown, Model: BATAVIBAKER, Cal: 16, SN: 152116
CIII.     Rifle, MNF: Brescia Armas, Model: 1936 XIV, Cal: 762, SN: D8840
CIV.      Shotgun, MNF: unknown, Model: 66, Cal: 12, SN: none
CV.       Shotgun, MNF: Winchester, Model: 37, Cal: 16, SN: none
CVI.      Rifle, MNF: Harrington and Richardson, Model: UNK, Cal: 12, SN: 35853C
CVII.     Shotgun, MNF: Savage, Model: Stevens, Cal: 12, SN: none
CVIII.    Shotgun, MNF: Remington Arms Company, Inc., Model: 200D, Cal: 12, SN: none

(Filing 70 (Preliminary Order of Forfeiture).)

There were no objections to the presentence report (PSR) and I adopted that report. (Filing 77 (Tentative Findings).) The defendant was 43 at the time of sentencing in 2006. (PSR at 2.) His mother, Wanda, was 73 years of age at the time of sentencing. (PSR ¶ 49.) The defendant's father, Cecil, died in February of 2000. (PSR ¶ 48.)

The defendant had a long history of marijuana abuse. (PSR ¶ 55.) He also occasionally used methamphetamine, but he claimed to have stopped using methamphetamine about year prior to his arrest. (PSR ¶ 55.)

The defendant obtained his high school diploma much later than is typical. (PSR ¶ 56.) As we shall see, the defendant's brother, David, paid for that schooling and he also paid for training so that Ricky could become a gunsmith.

The probation officer interviewed Mrs. McCollum. She reported that "most of the firearms located in the defendant's residence belonged to her" and "[s]he further reported that the defendant's father had collected the firearms." (PSR ¶ 49.) At that

-7-

residence, and between 2000 and 2004, the defendant had operated Blue Hollow Gun Works.  (PSR ¶ 59.)

The government told the probation officer that three cooperating individuals had provided information that in mid-2003 the defendant traded a gun to a known methamphetamine user, Michael Andrews, in exchange for cash and methamphetamine.[5]  (PSR ¶ 17.)  The defendant admitted that the "charge is true." (PSR ¶ 20.)  On October 31, 2005, Andrews was sentenced to 180 months in prison for his involvement in a methamphetamine conspiracy and possession of a firearm during a drug trafficking offense.  (PSR ¶ 15.)

Ricky T. McCollum's criminal history Category was I and his total offense level was 12.  (PSR ¶ 66.)[6]  His Guidelines imprisonment range was 10 to 16 months. (PSR ¶ 66.)  He was eligible for a split sentence.  (PSR ¶ 67.)  In May of 2006, and upon the recommendation of the probation officer,  I sentenced the defendant to 5 months in prison and 3 years of supervised release with 5 months of that supervised release requirement to be served in the home confinement program.  (Filing 80 (Judgment).)

### B.  Mrs. McCollum's Evidence

Mrs. McCollum attended the hearing together with her other son, David McCollum.  They offered testimony and documentary evidence that tended to support much, but not all, of Mrs. McCollum's claim.

---

[5]According to a search warrant affidavit, Andrews told the ATF that McCollum was to "manufacture" the weapon.  (Government's Ex. 1 at 4 ¶ 6.)

[6]The statutory range for this Class C felony was 0-10 years in prison.  (PSR ¶ 65.)

### *1. The Testimony of Mrs. McCollum*

Mrs. McCollum, who is hard of hearing but very sharp-minded, testified that she had been married to her husband Cecil (Todd) McCollum for over 50 years and that she was 73 years of age. (Tr. 8, 18.)   She said her late husband worked for the railroad for 42 years.  (Tr.  39.)  Cecil collected guns all of his life, and his large collection included guns handed down from his father, grandfather and great grandfather.  (Tr. 9, 13.)  He died in 2000, leaving Mrs. McCollum, the defendant and David McCollum as the sole surviving heirs.  (Tr.  10-11.)

While there was no will, and no probate proceedings, Mrs. McCollum believed that she inherited her husband's gun collection and she claimed that collection as her own.  (Tr. 10, 14, 23.)  She specifically testified that she never gave the gun collection to the defendant, stating "they were my guns until I passed away." (Tr. 14.)  Pursuant to an understanding that she had with her husband, and after she passed away, the guns were to be divided between her two sons.  (Tr.  14.)   According to Mrs. McCollum, that was only "natural."  (Tr. 14.)

Mrs. McCollum said that she left the rural (and very modest) family home sometime in 2001 (Tr.  28), after her husband died, because she was diagnosed with cancer and told that she needed back surgery.  (Tr. 9-10, 12.)   She then moved into town, presumably so she could be close to her medical providers.  When she moved she left the guns and other personal property at the family home (Tr. 12) and asked the defendant to "go out and stay in the house" because "I didn't know what else to do at the time." (Tr. 14.)  (As we shall see, Mrs. McCollum's other son lives in Arizona.)  She said the gun collection was left in the house, particularly in a cabinet and under the bed in the room her husband used prior to his death.  (Tr.  47-48.)

Mrs. McCollum affirmed that she and her husband owned the home and that she still owned the home.  (Tr. 15.)   The government admitted that this was true.  In fact,

-9-

the case agent specifically testified that Mrs. McCollum holds the title to the residence where the guns were found and she pays the taxes on that real property. (Tr. 70.)[7]

Mrs. McCollum further testified that he son David had paid for the defendant to study and receive his high school diploma and to learn to be a gunsmith. (Tr. 16.) In that same vein, Mrs. McCollum added that she bought all the tools, parts and equipment the defendant needed to operate a gunsmith business and that she believed he operated that business from a shed adjacent to the family home. (Tr. 17-18.) Mrs. McCollum testified that the defendant had a firearms license (Tr. 19-20) and the government agreed that the defendant acquired a federal firearms license in 2000 or 2001. (Tr. 51.)

Because of her health problems, Mrs. McCollum testified that she seldom went back to the family home. (Tr. 18, 28.) She specifically denied knowing that the defendant "was doing anything wrong out there." (Tr. 17.)

While Mrs. McCollum was sure her husband had purchased ammunition, she could not be specific about the type or quantity. (Tr. 24-25.) Additionally, and because she believed it belonged to the defendant's girlfriend, Mrs. McCollum admitted that she had no claim to a "Hipoint" rifle which is listed on the preliminary order of forfeiture. (Tr. 27.)[8]

After the death of her husband, and at the urging of her son David, Mrs. McCollum testified that she purchased the parts for a "Serbu 50 caliber" rifle so the defendant could build the gun, and learn how to work "on these 50 calibers." (Tr. 16.) She said that the gun was also to be a tribute to her late husband who always

---

[7]However, the government was unaware that Mrs. McCollum owned the home at the time the guns were seized. (Tr. 70.)

[8]That weapon appears to be item "LVII" on the preliminary order of forfeiture. (Filing 70 at 7.)

-10-

wanted to go to Africa and hunt. (Tr. 16.) The defendant was supposed to place the words "Hot Totty," her husband's nickname, on the weapon. (Tr. 16.) There is a gun that partially matches Mrs. McCollum's description on the preliminary order of forfeiture.[9]

## 2. *The Testimony of David McCollum*

David McCollum testified that he was nearly 50 years of age, that he was retired from a career in the Marines, that he had been a warrant officer, and that he presently worked for the United States as an engineer at a Marine Corps base in Arizona. (Tr. 30-31.) He was candid and extremely credible.

David McCollum confirmed that his father had a large gun collection. (Tr. 31-32.) In fact, it was so large that shortly after his father passed away David and his wife prepared a partial[10] inventory of the weapons. (Tr. 32-34; McCollum Exhibit 2.[11]) David McCollum produced a copy of the inventory, but acknowledged that it was difficult to read. (Tr. 34; McCollum Ex. 2.)

David McCollum testified that his father, shortly before his death, asked David to help Ricky because Ricky's life had been troubled and Ricky had little education and no trade. (Tr. 35.) David agreed and thus paid for schooling that provided Ricky with his high school diploma and the skills necessary to become a gunsmith. (Tr. 35.)

---

[9]That weapon appears to be item "LVIII" on the preliminary order of forfeiture. (Filing 70 at 7.) The preliminary order of forfeiture does not, however, indicate that the words "Hot Totty" are on this weapon.

[10]He stated that "[w]e just kinda jetted through it hurriedly . . . ." (Tr. 33.)

[11]I reserved ruling on the McCollum exhibits to give the government an opportunity to review them and submit objections. (E.g, Tr. 34.) The government has not objected to the exhibits and they are now received.

After his father died, David stated his mother purchased tools and equipment so that Ricky could work as a gunsmith. (Tr. 35.) David stated (and lamented) that he was responsible for his mother buying the parts for the 50 caliber rifle. (Tr. 35-36.) He asked his mother to buy the parts and provide them to Ricky so he could "get training on a weapon that the military was using." (Tr. 36.) He also confirmed that he wanted his brother to put his father's name on the weapon. (Tr. 36.)

David McCollum testified that he visited the family home in 2003. At that time he saw guns in a cabinet in his father's bedroom, guns hanging on the wall in the living room and guns under the bed in his father's room. (Tr. 46-47.)

During the life of their father, David McCollum testified that both he and Ricky McCollum bought guns at the direction of and for their father with money their father had given them. (Tr. 38.) The elder McCollum, who had no criminal record, directed his boys to buy weapons for him because he wanted to avoid a dispute with his wife about acquiring more guns. (Tr. 39.) David McCollum did not believe Ricky McCollum ever had the money to buy guns for himself. (Tr. 38.)

### 3.   *Mrs. McCollum's Exhibits*

Mrs. McCollum presented three exhibits. McCollum Exhibit 1 consists of various credit card receipts, invoices and tax statements. Among other things, the records show that Mrs. McCollum paid the taxes on the real property where the defendant lived and that she bought and paid for many items clearly related to the defendant's gunsmith business.

Notably, the invoices from Brownells, Inc., show that from 2001 to 2005 a large number of tools, parts and equipment related to the gunsmith business were shipped directly to "MCCOLLUM GREEN HOLLOW GUN WORK" and "RICKY MCCOLLUM." From those invoices, it appears that Mrs. McCollum's Visa card was the source of the payments.

-12-

McCollum Exhibit 2 is the inventory of the gun collection prepared by David McCollum and his wife shortly after David's father died. While it is very difficult to read, I count over 60 shotguns and rifles listed on the document. This number is consistent with the 67 rifles and shotguns listed on the preliminary order of forfeiture.

However, and because the inventory is hard to read and because it uses different descriptive words, I cannot match the rifles and shotguns listed on the inventory with the rifles and shotguns listed on the preliminary order of forfeiture. As a result, I cannot be absolutely certain that the guns on the inventory are the same guns listed on the preliminary order of forfeiture. That said, it is more probable than not that many of them are the same.

A few handguns (including a revolver) are also listed on the inventory, and one handgun (described as a revolver) is listed on the preliminary order of forfeiture. Once again, it is not possible to match any of the handguns shown on the inventory with the handgun on the preliminary order of forfeiture.

Save for a reference to "black powder," no ammunition is listed on the inventory. Numerous items of ammunition are listed on the preliminary order of forfeiture.

McCollum Exhibit 3 contains several affidavits and letters stating that Cecil "Todd" McCollum owned an extensive gun collection prior to his death. For example, Lt. Colonel Craig Watts submitted an affidavit.

Among other things, Watts stated that he had been in the McCollum home on numerous occasions over many years while the senior McCollum was alive. Watts knew that "Todd" McCollum had a large gun collection. He recalled "counting some fifty different rifles and shotguns" and one revolver. (McCollum Ex. 3; Affidavit of Craig Watts dated May 22, 2006).)

-13-

### C. The Government's Evidence

The government presented the testimony of Clay Nolte, a special agent with the ATF. Agent Nolte was also very credible. The government additionally presented exhibits that were received into evidence.

Agent Nolte sketched the background for his investigation into the affairs of the defendant and his application for a search warrant. (Tr. 50-51; Government's Exhibit 1 (Application and Affidavit for Search Warrant and Search Warrant).) The agent also described his execution of the search warrant and what he found. (E.g., Tr. 55.)

Agent Nolte testified that he found numerous guns in the residence and some of them were loaded. (Tr. 55.) The "majority of them" were in "the master bedroom" in a cabinet. (Tr. 55.) There were guns displayed on the wall of the house and probably "12 to 15 guns stacked just in a leaning position [against] the wall . . . ." (Tr. 55.) While most of the weapons were found in the house, Nolte thought that "close to a dozen firearms" were found in the shed. (Tr. 55.) The agent estimated that he seized approximately 70 guns and "probably over 100 pounds of ammunition." (Tr. 57.)

When the defendant returned to the home sometime after the execution of the warrant, the agents interviewed him. He admitted that he had given a gun to an individual and received methamphetamine in return. (Tr. 58.) At various times, the defendant also said the guns found in the residence and shed belonged to his deceased father, or they were "his and his Dad's," or "they were his guns." (Tr. 58-59; Government's Exhibit 3 (tape of post-arrest interview).) The defendant did not mention his mother. (Tr. 58.) The defendant was upset when he learned the guns were to be confiscated by the government, and stated that his brother, who lived in Arizona, would want the guns. (Tr. 58.)

By searching postal service records, the agent confirmed that Mrs. McCollum had moved into town. (Tr. 63.) He believed she moved to town "around 2002" but she might have moved earlier. (Tr. 63.) The agent also confirmed that title to the real property belonged to Mrs. McCollum and that she paid the taxes. (Tr. 70.) The agent did not know of Mrs. McCollum's interest until after she filed a claim in this case. (Tr. 61-62, 70.)

The agent presented a video documenting the search of the home and the shed. (Government's Exhibit 2.) I have reviewed the video. From that review, I find that most of the weapons were located in the home. Only a few[12] weapons were located in the shed and those weapons cannot be specifically identified from the video.[13] Most of the ammunition was found in one or more drawers in the shed.

I saw at least one weapon displayed on the wall of the shed and that display was generally similar to a display in the home. I also saw what may have been a "receiver" on a bench.[14] The shed also contained numerous parts, tools, and equipment that are obviously associated with a gunsmith's business.

As shown on the video, the shed itself was locked when the agents executed their search warrant. They had to break the lock. On the video, the defendant's girl

---

[12]As indicated in the text, Nolte testified that he estimated that there were approximately 12 guns in shed. Although it is hard to be sure, my review of the video suggests that Nolte's estimate is too high and fewer than 12 weapons were in the shed.

[13]The government did not offer evidence specifically showing where each gun was located at the time of the seizure.

[14]A "receiver" is "the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached." Webster's Third New International Dictionary, 1894 (1986). A "receiver" is listed as item IV on the preliminary order of forfeiture. (Filing 70 at 5.)

-15-

friend is heard to say that the defendant has the only key to the shed and he was not then available. The shed is only a few feet from the residence.

During the testimony of Mrs. McCollum, the government represented that three weapons, 2 handguns and a rifle, belonged to Charlie Bressman and those weapons were apparently returned to him. (Tr. 26-27.) Those weapons are not described on the preliminary order of forfeiture. There is no evidence showing where those weapons were located at the time of the seizure. Specifically, it is not possible to determine from the video whether those weapons were located in the residence or in the shed.

## II.  ANALYSIS

I first review federal law. Then I examine the government's concessions and Nebraska law. After that, I apply the law to the facts.

### A.  Federal Law

Although this is a criminal case, the matter before me is quasi-civil in nature and arises pursuant to 21 U.S.C. § 853(n) (criminal forfeiture and third-party interests). After an initial order of forfeiture has been entered in a criminal case against a defendant and his property, the law allows an interested third-person to contest the forfeiture of the property by filing a "petition" to "adjudicate the validity of [the third-person's] alleged interest in the property." 21 U.S.C. § 853(n)(2).

If such a petition is submitted within the time allowed by law, the judge is obligated to hold a hearing. Id. The hearing is "before the court alone, without a jury." Id. After the hearing, "the court shall amend the order of forfeiture" to protect the interests of the third-party *if* that party has proven "by a preponderance of evidence" at least one of two things:

-16-

(1)   (a) the petitioner has a legal right, title or interest in the property, and (b) such right, title or interest renders the forfeiture order invalid in whole or in part because (I) the right, title or interest was vested in the petitioner rather than the defendant or (ii) was superior to any right, title or interest of the defendant at the time of the commission of the acts which give rise to the forfeiture of the property;

*or*

(2)   (a) the petitioner is a bona fide purchaser for value of the right, title or interest in the property and (b) was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture.

*Compare* 21 U.S.C. § 853(n)(6)(A) *with* 21 U.S.C. § 853(n)(6)(B).

In addition to the statutory rules, an Eighth Circuit case, United States v. Totaro, 345 F.3d 989 (8th Cir. 2003), presents two important additional principles that are also applicable here.  They are:

(1)   When deciding whether a claimant under 21 U.S.C. § 853(n) has an interest that must be protected, the court looks to state law to determine the nature and extent of the claimed interest except when that law frustrates an important federal interest.   Totaro, 345 F.3d at 994 (reversing forfeiture of wife's interest and remanding the case for further proceedings; construing 18 U.S.C. § 1963(*l*), but stating that it is identical to 21 U.S.C. § 853(n) and relying on cases decided under section 853(n); applying New York law).

-17-

(2)     Under 21 U.S.C. § 853(n), a third-party who innocently acquires an interest in the subject property is protected to the extent of that interest even though the defendant may have subsequently exercised some dominion or control over the property.  Totaro, 345 F.3d at 987 (the district court's decision that wife of husband who was convicted of 61 counts of RICO violations had forfeited entire estate, consisting of two parcels of land, unimproved house, and improvements to land, based on finding that wife had no interest that was superior to husband's, was in error, even though proceeds from husband's RICO violations were filtered through wife's checking account to pay for mortgages, real estate taxes, and maintenance; wife proved by preponderance of the evidence that she received one-half of first land parcel as gift from husband with funds untainted by the RICO violations and that she purchased remaining one-half of parcel from one of husband's creditors apparently without assistance from husband).

## B.   The Government's Concessions and Nebraska Law

Relying upon Nebraska law, the government candidly states:

> According to Mrs. McCollum's testimony, she acquired an interest in the weapons found in Ricky McCollum's possession through intestate succession following her husband's death.  Based on her testimony, she appears to be a *bona fide* purchaser for value of some weapon parts she purchased for Ricky.[15]  Additionally, based on the marital interest she had or acquired upon her husband's death, she would have had a superior

---

[15] See generally Maryott v. Oconto Cattle Co., 607 N.W2d 820, 829 (Neb. 2000) (discussing the differences between Nebraska common law and Nebraska's version of the Uniform Commercial Code as applied to "a good faith purchaser for value").

legal right, title or interest in the weapons at the time of her husband's death.[16]

(Filing 90 at 4-5 (Government's Brief) (Italics in original).)

I agree with the government's use and reading of Nebraska law. Indeed, I decide that in this case application of Nebraska law will not frustrate a federal interest. Subject to qualifications which I discuss later, I further decide that (1) Mrs. McCollum held sole title, or possessed a superior legal right, to the gun collection[17] as a result of the intestacy laws[18] or (2) she was a bona fide purchaser for value of the 50 caliber rifle[19] and the receiver and she was without notice of her son's illegality.[20]

However, the government does not give up. It argues that when Mrs. McCollum left the family home, after her husband died, "she gifted the weapons to Ricky . . . ." (Filing 90 at 5.) The United States also contends that she she made a gift of "the weapons parts she had purchased for him." (Filing 90 at 5.)

Under Nebraska law, in order to prove that a gift has been made, a party must present evidence that shows three things. See, e.g., In re Estate of Lamplaugh, 708 N.W.2d 645, 650 (Neb. 2006) (applying Nebraska law to a gift of a check). That is,

_____

[16]The government cites Neb. Rev. Stat. § 30-2302(3) (defining the interest of a surviving spouse where there are children but no will; the wife takes the first $50,000 of the decedent's estate and one half of the remainder). (Filing 90 at 5.)

[17]As discussed later, I decide that the gun collection did not include ammunition. I also decide that Mrs. McCollum was not a bona fide purchaser of the ammunition and, even if she was, she gave the ammunition to the defendant.

[18]21 U.S.C. § 853(n)(6)(A).

[19]Mrs. McCollum makes no claim to the "Hipoint" rifle. (Tr. 27.) Therefore, no further discussion of that weapon is required.

[20]21 U.S.C. § 853(n)(6)(B).

-19-

"there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee." Id. (citation omitted.)

Perhaps the most import element of this three-part test is the donor's intent. Thus, a "clear and unmistakable intention on the part of the donor to make a gift of his or her property is an essential element of the gift, and this contention must be inconsistent with any other theory." Id. (Citation omitted; emphasis added.)

The government's gift argument requires a more detailed analysis before a proper decision can be made. With that and other issues to resolve, I next apply the law to the facts.

### C.  The Law Applied to the Facts

I first examine the law and the facts regarding the gun collection.  Then, I discuss the remaining property.

### 1.  The Gun Collection

Two questions require discussion.  They are: (1) What does the gun collection include?  (2) Did Mrs. McCollum give the gun collection to Ricky, the defendant?

First, while the parties have spoken generically about a "gun collection" and the government does not dispute that Cecil (Todd) McCollum actually assembled a very large "gun collection," there is a certain degree of ambiguity about what makes up that collection.   As best I can, I now resolve that ambiguity.

I find by the greater weight of the evidence that the "gun collection" does not include the ammunition, the receiver, a rifle described as "MNF: Hipoint, Model: 995, Cal: 9, SN: A20651" and a rifle described as "MNF: Serbu Firearms, Model: BFG-50, Cal: 50, SN: 523."   I come to this decision, for among other reasons, the following:

-20-

- Mrs. McCollum has failed to convince me by the greater weight of the evidence that the collection included ammunition of the type and quantity found in the shed. Her evidence is too vague. Specifically, there is no evidence that Cecil (Todd) McCollum possessed 100 pounds of ammunition (the amount found by the ATF) at the time of his death. Although not dispositive, I also note that most of the ammunition was found in drawers in the shed, the shed was locked and the shed was under the exclusive control of the defendant at the time of the seizure.

- Mrs. McCollum does not contend that the two rifles or the receiver I have excluded were a part of the gun collection. Even if she did, her evidence would be insufficient.

Save for the two rifles mentioned above, I also find by the greater weight of the evidence that the gun collection includes all the rifles, all the shotguns and the one revolver listed on the preliminary order of forfeiture. I come to this decision, for among other reasons, because of the following:

- Over 60 rifles and shotguns are listed on the inventory prepared shortly after Cecil (Todd) McCollum's death and roughly the same number of rifles and shotguns are listed on the preliminary order of forfeiture. A revolver is also listed on the inventory and on the preliminary order of forfeiture. There is no evidence that any of the items listed on the inventory were disposed of between the time of the inventory and the time of the seizure.

- Save for the Serbu rifle excluded from the collection, there is no evidence that any of the rifles or shotguns listed on the preliminary order of forfeiture were assembled by the defendant or were otherwise "homemade."

-21-

- Most of the weapons were found where Mrs. McCollum left them; that is, the great majority of the weapons were found in the bedroom used by her husband and otherwise throughout the house where they had previously been kept. While several weapons were found in the shed, and the shed was under the exclusive control of the defendant, there is no evidence that the defendant made or assembled those weapons. In fact, one weapon was displayed on the wall of the shed in a manner similar to a display in the home. This similarity suggests that the weapon displayed in the shed was a part of the gun collection and it further suggests that the defendant may have moved a few pieces of the collection into the shed for display purposes.

- The inventory lists a revolver and so does the preliminary order of forfeiture.

Second, having determined that Mrs. McCollum owned the gun collection outright (or at least held a superior legal interest to it) as a result of Nebraska's intestacy laws, and having now defined the scope of the collection, I must address the government's contention that Mrs. McCollum made a gift of the collection to her son Ricky, the defendant. I turn to that issue now.

The evidence does not convince me that Mrs. McCollum made a gift of the gun collection to the defendant. On the contrary, the persuasive evidence shows that Mrs. McCollum intended to keep the collection in tact so that *both* of her boys would enjoy the fruits of their father's collection upon her death. As she said, that was only "natural." (Tr. 14.) In short, the evidence wholly fails to show that Mrs. McCollum did anything to manifest a "clear and unmistakable intention . . . to make a gift" of the gun collection. In re Estate of Lamplaugh, 708 N.W.2d at 650 (emphasis added).

-22-

In particular, I am not persuaded by the government's argument that Mrs. McCollum intended to make a gift of the gun collection because she left her rural home and its contents and allowed Ricky to move into the home. Given the fact that Mrs. McCollum was sick with cancer and suffered from a back problem thus necessitating a move into town for medical reasons, given the further fact that her one son, David, lived in Arizona and that Mrs. McCollum credibly testified that she essentially asked her other son, Ricky, to become a caretaker for the home and its contents due to her illness, and given the fact that there is no reason to think that Mrs. McCollum was motivated to "disinherit" David when it came to the gun collection,[21] the evidence fails to prove that Mrs. McCollum "clearly" and "unmistakably" expressed her intent to make a gift of the gun collection to the defendant. On the contrary, Mrs. McCollum continued to pay taxes on the home. This is strong, objective and contemporaneous evidence of her desire to preserve her legal right to the home and all its contents.

## 2. *The Other Property*

I turn next to property not included in the gun collection. That property is the ammunition, the receiver and the 50 caliber rifle. Three points should be made.

First, and as for the ammunition, there is no evidence that Mrs. McCollum paid for it. I have carefully reviewed the bank card statements and the other evidence (McCollum Exhibit 1) and those records, while documenting other gunsmith-related purchases, do not clearly document ammunition purchases. Therefore, the evidence does not show by the greater weight of the evidence that she was a bona fide purchaser for value of the ammunition within the meaning of 21 U.S.C. § 853(n)(6)(B).

---

[21]Had she done so, she would have acted in direct contravention of the wishes of her husband (Tr. 14) and there is simply no reasons to think that Mrs. McCollum was so inclined. Moreover, we know David cared deeply about his Dad's gun collection since he went to the trouble of making an inventory of the collection after his father's death. Thus, there is also no reason to think that David would have encouraged his mother to give the collection to Ricky.

-23-

Second, and on the other hand, the records (McCollum Exhibit 1) do clearly demonstrate the purchase of Serbu rifle parts and various other parts which could have included the receiver.   As indicated earlier, I decide that Mrs. McCollum was a bona fide purchaser for value of those items within the meaning of 21 U.S.C. § 853(n)(6)(B). And, as I have also stated earlier, I believe that she had no notice of her son's illegal behavior.  (Indeed, her son possessed a license issued by the federal government.)

Third, assuming that Mrs. McCollum was a bona fide purchaser for value of the ammunition (even though I have found otherwise) and having found that she was a bona fide purchaser for value of the Serbu rifle parts and the receiver, and having also found that she was without notice of her son's illegal behavior, I nevertheless conclude that Mrs. McCollum made a gift of those items to the defendant.   Among others, I arrive at this decision for the following reasons.

- Mrs. McCollum's own evidence (McCollum Exhibit 1) conclusively shows that she bought the items Ricky used in his business, but permitted them to be shipped directly to the defendant in his name or in the name of his gunsmith business. She maintained no legal interest in these items once they were delivered.  For example, she failed to take a security interest in the items under the Uniform Commercial Code.  As a result, it would have been apparent to Mrs. McCollum that her son was free to dispose of these items in his ongoing business despite the fact that she bought and paid for them.  Indeed, the defendant operated the business from a locked shed that could be accessed only by the one key that only he possessed.

- Still further, and perhaps most importantly, it is obvious that Mrs. McCollum intended to "give" her son the parts and equipment because the practice of making "gifts" to support Ricky's gunsmith business had become a "family tradition."   Just as David

-24-

McCollum supported his brother by making a "gift" of tuition so that Ricky could become a gunsmith, Mrs. McCollum made a gift of the paraphernalia necessary to operate Ricky's gunsmith business.

### III.  CONCLUSION

I respectfully offer Mrs. McCollum some free advice, but it is entirely up to her whether she accepts or rejects it.  My advice is this:

> *Ricky is a convicted felon.  He cannot legally possess a gun.*
> *For practical purposes, he can't even be around guns.  It*
> *would be a good idea to ask David to help you with the*
> *collection.*

IT IS ORDERED that:

1.     Wanda T. McCollum's motion (filing 75), construed as a petition pursuant to 21 U.S.C. § 853(n), is denied in part and granted in part as hereinafter provided.

2.     Referring to the numbering method used in the preliminary order of forfeiture (filing 70), Mrs. McCollum's petition is denied as to the ammunition, a receiver and two rifles, all of which are hereinafter described, such property is finally forfeited to the government, and the government may dispose of said property, to wit:

| | |
|---|---|
| I. | Ammunition, Qty: 1; MNF: other, Cal: 37 |
| II. | Ammunition, Qty: 19; MNF: Remington, Cal: 257 |
| IV. | Receiver, Model: Model 98, Cal: **, SN: none |
| VI. | Ammunition, Assorted, Qty: 111; MNF: Remington, Cal: 12 |
| VIII. | Ammunition, Qty: 188; MNF: unknown, Cal: 765 |
| XIII. | Ammunition, Assorted Qty: 22; MNF: other, Cal: 257 |
| XIV. | Ammunition, Qty: 54; MNF: Remington, Cal: 7 |
| XV. | Ammunition, Qty: 1; MNF: Winchester-Western, Cal: 300 |

| XVI. | Ammunition, Qty: 6; MNF: Remington, Cal: 22-250 |
| XVII. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 270/20 |
| XVIII. | Ammunition, Qty: 11; MNF: Winchester-Western, Cal: 308 |
| XIX. | Ammunition, Qty: 78; MNF: Federal, Cal: 30-06 |
| XX. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 243 |
| XXI. | Ammunition, Qty: 51; MNF: Winchester-Western, Cal: 30-30 |
| XXII. | Ammunition, Qty: 11; MNF: unknown, Cal: 792 |
| XXIII. | Ammunition, Qty: 1; MNF: Winchester-Western, Cal: 220 |
| XXIV. | Ammunition, Qty: 142; MNF: Federal, Cal: 12 |
| XXV. | Ammunition, Qty: 8; MNF: unknown, Cal: 50 |
| XXVI. | Ammunition, Qty: 4; MNF: Remington, Cal: 44 |
| XXVIII. | Ammunition Components, Qty: 1720; MNF: Winchester-Western, Cal: ** |
| XXIX. | Ammunition, Qty: 51; MNF: Federal, Cal: 12 |
| XXX. | Ammunition, Qty: 226; MNF: Remington, Cal: 12 |
| XXXI. | Ammunition, Qty: 400; MNF: other, Cal: 762 |
| XXXII. | Ammunition, Qty: 164; MNF: Winchester-Western, Cal: 12 |
| XXXIII. | Ammunition, Qty: 50; MNF: Winchester-Western, Cal: 16 |
| XXXIV. | Ammunition, Qty: 20; MNF: Winchester-Western, Cal: 20 |
| XXXV. | Ammunition, Qty: 9; MNF: Westerfield, Cal: 20 |
| XXXVI. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 10 |
| XXXVII. | Ammunition, Assorted, Qty: 97; MNF: Remington, Cal: 22 |
| XL. | Ammunition, Qty: 28; MNF: Remington, Cal: 410 |
| XLII. | Ammunition, Qty: 3; MNF: Remington, Cal: 10 |
| XLIII. | Ammunition, Qty: 10; MNF: Remington, Cal: 28 |
| XLIV. | Ammunition, Qty: 4; MNF: Fiocchi, Cal: 303 |
| XLVI. | Ammunition, Qty: 72; MNF: LC (Lake City), Cal: 30 |
| XLVII. | Ammunition, Qty: 14; MNF: Winchester-Western, Cal: 45 |
| XLVIII. | Ammunition, Qty: 22; MNF: PMC, Cal: 223 |
| XLIX. | Ammunition, Qty: 5; MNF: Winchester-Western, Cal: 44 |
| L. | Ammunition, Qty: 40; MNF: other, Cal: 6 |
| LI. | Ammunition, Qty: 50; MNF: United States Cartridge Co., Cal: 9 |
| LII. | Ammunition, Qty: 6; MNF: Winchester-Western, Cal: 380 |
| LVII. | Rifle, MNF: Hipoint, Model: 995, Cal: 9, SN: A20651 |
| LVIII. | Rifle, MNF: Serbu Firearms, Model: BFG-50, Cal: 50, SN: 523 |

3.     Referring to the numbering method used in the preliminary order of forfeiture (filing 70), Mrs. McCollum's petition is granted as to the rifles, shotguns and

handgun hereinafter described, and the government shall return said property to Mrs. McCollum, to wit:

| | |
|---|---|
| III. | Rifle, Model: Hoban Rifle, Cal: 22, SN: 45 |
| V. | Shotgun, MNF: unknown. Receiver only, Model: unknown, Cal: **, SN: none |
| VII. | Shotgun, MNF: Ithaca Gun Co. Model: 51 Fetherlight, Cal: 12, SN: 510019487 |
| IX. | Rifle, MNF: unknown, Model: McCollums, Cal: 270, SN: 003 |
| X. | Shotgun, MNF: unknown, Model: Hiawatha 130 Vr-F, Cal: 20, SN: none |
| XI. | Shotgun, MNF: Savage, Model: 94 series M, Cal: 410, SN: C517713 |
| XII. | Shotgun, MNF: unknown, Model: SB-100B, Cal: 20, SN: B084872 |
| XXVII. | Shotgun, MNF: Harrington and Richardson, Model: 155, Cal: 45-70, SN: AM288419 |
| XXXVIII. | Rifle, MNF: Savage, Model: 170B, Cal: 30-30, SN: D262099 |
| XXXIX. | Rifle, MNF: Marlin Firearms Co., Model: Glenfield Model 10, Cal: 22, SN: unknown |
| XLI. | Shotgun, MNF: Laurona-Armas Eibar, S.A.L., Model: Double Barrel, Cal: ZZ, SN: 816421 |
| XLV. | Shotgun, MNF: unknown, Model: JC Higgins 583.16, Cal: 12, SN: none |
| LIII. | Shotgun, MNF: Ithaca Gun Co., Model: Double Barrel, Cal: ZZ, SN: unknown |
| LIV. | Rifle, MNF: Bellmore-Johnson Tool, Model: Bolt Action, Cal: 22, SN: unknown |
| LV. | Shotgun, MNF: Hopkins and Allen, Model: Double Barrel, Cal: ZZ, SN: unknown |
| LVI. | Handgun, MNF: unknown, Manufacturer Type: Revolver, Model: OFI Western Ranger, Cal: 22, SN: RR00241 |
| LIX. | Rifle, MNF: Harrington and Richardson, Model: Topper Model 158, Cal: 30-30, SN: AS205284 |
| LX. | Rifle, MNF: Ranger Arms Inc., Model: 103, Cal: 22, SN: none |
| LXI. | Rifle, MNF: Western Arms Co., Model: 59, Cal: 22, SN: none |
| LXII. | Shotgun, MNF: Westley, Richard, Model: Double Barrel, Cal: 16, SN: 51389 |

LXIII.       Rifle, MNF: unknown, Model: Bolt Action Rifle, Cal: 308, SN: 001

LXIV.        Shotgun, MNF: unknown, Model: Double Barrel, Cal: 16, SN: none

LXV.         Rifle, MNF: unknown, Model: unknown, Cal: 410, SN: 49061

LXVI.        Rifle, MNF: Harrington and Richardson, Model: 700 22 WMRF, Cal: 22, SN: AS501498

LXVII.       Shotgun, MNF: unknown, Model: none listed, Cal: 410, SN: none

LXVIII.      Shotgun, MNF: unknown, Model: Batavia Leader, Cal: 16, SN: 95218

LXIX.        Shotgun, MNF: Remington Arms Company Inc., Model: Double Barrel, Cal: 16, SN: 1087

LXX.         Shotgun, MNF: unknown, Model: 60, Cal: 12, SN: none

LXXI.        Shotgun, MNF: Marlin Firearms Co., Model: Marlin Goose Gun, Cal: 12, SN: 71375287

LXXII.       Rifle, MNF: unknown, Model: 1915, Cal: 22, SN: M347

LXXIII.      Rifle, MNF: unknown, Model: Six Corp, Cal: 762, SN: 8803159

LXXIV.       Rifle, MNF: Winchester, Model: 67, Cal: 22, SN: none

LXXV.        Rifle, MNF: Hopkins and Allen, Model: none listed, Cal: 22, SN: none

LXXVI.       Rifle, MNF: R.B. Rodda, Model: none listed, Cal: 243, SN: 26599

LXXVII.      Shotgun, MNF: Hopkins and Allen, Model: Double Barrel, Cal: 16, SN: 32483

LXXVIII.     Rifle, MNF: Chipmunk Manufacturing Co., Model: Chipmunk 22 SL, Cal: 22, SN: 22411

LXXIX.       Shotgun, MNF: unknown, Model: none listed, Cal: 12, SN: 58044A

LXXX.        Rifle, MNF: Italy, Model: Fillipietta Cat 3046, Cal: 22, SN: SA6882

LXXXI.       Rifle, MNF: Remington Arms Company Inc., Model: Fieldmaster 572, Cal: 22, SN: A1414103

LXXXII.      Rifle, MNF: unknown, Model: UNK, Cal: 308, SN: none

LXXXIII.     Rifle, MNF: unknown, Model: M1 Carbine, Cal: 30, SN: none

LXXXIV.      Rifle, MNF: unknown, Model: none listed, Cal: 762, SN: 61295

LXXXV.       Rifle, MNF: BSA (Birmingham Small Arms), Model: Lever Action, Cal: 32, SN: 19314

LXXXVI.      Rifle, MNF: Savage, Model: 15, Cal: 22, SN: none

LXXXVII.     Rifle, MNF: Mossber, Model: 810AHT, Cal: 30-06, SN: 1010064

-28-

| | |
|---|---|
| LXXXVIII. | Rifle, MNF: Winchester, Model: 74, Cal: 22, SN: 274591A |
| LXXXIX. | Rifle, MNF: Remington Arms Company, Inc., Model: 12-C, Cal: 22, SN: RW448317 |
| XC. | Rifle, MNF: Browning, Model: UNK, Cal: 12, SN: 0017 |
| XCI. | Rifle, MNF: Harrington and Richardson, Model: Shikari 155, Cal: 44, SN: AS228207 |
| XCII. | Rifle, MNF: Harrington and Richardson, Model: Topper M48, Cal:410, SN: J55626 |
| XCIII. | Rifle, MNF: Harrington and Richardson, Model: 176 10 G Magnum, Cal: 10, SN: AS217937 |
| XCIV. | Shotgun, MNF: Ranger Arms Company, Inc., Model: UNK, Cal: 12, SN: 4370 |
| XCV. | Shotgun, MNF: Remington Arms Company, Inc., Model: 870, Cal:12, SN: 840197V |
| XCVI. | Rifle, MNF: Springfield Firearms Corporation, Model: UNK, Cal: 22, SN: none |
| XCVII. | Shotgun, MNF: Springfield Firearms Corporation, Model: UNK, Cal: 12, SN: Y370 |
| XCVIII. | Shotgun, MNF: Mossberg, Model: 1000, Cal: 12, SN: FD09288 |
| XCIX. | Rifle, MNF: Mauser, Model: Argentino 1891, Cal: **, SN: B9190 |
| C. | Shotgun, MNF: Savage, Model: 77F, Cal: 12, SN: none |
| CI. | Shotgun, MNF: Remington Arms Company, Inc., Model: 870, Cal: 16, SN: S669351V |
| CII. | Shotgun, MNF: Unknown, Model: BATAVIBAKER, Cal: 16, SN: 152116 |
| CIII. | Rifle, MNF: Brescia Armas, Model: 1936 XIV, Cal: 762, SN: D8840 |
| CIV. | Shotgun, MNF: unknown, Model: 66, Cal: 12, SN: none |
| CV. | Shotgun, MNF: Winchester, Model: 37, Cal: 16, SN: none |
| CVI. | Rifle, MNF: Harrington and Richardson, Model: UNK, Cal: 12, SN: 35853C |
| CVII. | Shotgun, MNF: Savage, Model: Stevens, Cal: 12, SN: none |
| CVIII. | Shotgun, MNF: Remington Arms Company, Inc., Model: 200D, Cal: 12, SN: none. |

4.     The Clerk of the Court shall mail a copy of this memorandum and order to Mrs. McCollum.

-29-

August 9, 2006.                    BY THE COURT:

                                                  s/*Richard G. Kopf*
                                              United States District Judge